UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

EMEKA DOMINIC OKONGWU,

                    Plaintiff,

-v-                                                   CASE NUMBER:   **2 3   C V   4 9 0 - JLS**
                                                      JURY TRIAL DEMANDED

CITY OF BUFFALO POLICE DEPARTMENT,
CITY OF BUFFALO, and
DETECTIVE MARCIA SCOTT[1], individually and as an officer of
Buffalo Police Department.
                    Defendants

_____

## COMPLAINT

        Plaintiff, Emeka Dominic Okongwu, Pro Se, and in forma pauperis, hereby
respectfully presents the within complaint against the named defendants, upon information and
belief, as follows:

## NATURE OF THE ACTION

    1.    This is a civil action, pursuant to 42 U.S.C., Section 1983, and 28 U.S.C., Section
1367(a), seeking $36,000,000 in damages for the conducts and omissions of the above-named
defendants, in violating Plaintiff's guaranteed rights under the United States Constitution, to wit,
Fourth Amendment, Fourteenth Amendment, and state laws.

    2.    The defendants that are named in this complaint, collectively and individually,
through their actions and omissions, caused Plaintiff to suffer malicious prosecution, which
resulted in Plaintiff spending almost 20 years in prison, caused him to be beaten up while in the
custody of the defendants, in violation of his Eighth Amendment rights, and caused him to
endure the loss of various legal documents, in violation of his rights to property.

    3.    The mentioned violations against Plaintiff and the unconstitutional abuses are directly
and proximately caused by policies, practices and/or customs of the defendants, City of Buffalo,
Buffalo Police Department, Detective Marcia Scott of the Buffalo Police Department who acted
with deliberate indifference to the rights of individuals, including this Plaintiff, by (a) failing to
properly train, supervise and discipline their officers and agents, (b) by inadequately monitoring
their officers and agents in their practices relating to initiating criminal charges, including but not

_____

[1] Plaintiff did not find out and did not have available any information about the involvement of Marcia Scott in this
matter until on or around March 15, 2021 which tolls the statute of limitations for the claimed violations. See CPLR
Section 214-c (Discovery Rule)

limited to properly investigating, cases and handling accused individuals, in violation of Plaintiff's constitutional rights.

4.      Plaintiff suffered loss of life, liberty, happiness, family, reputation, earnings. He went through countless harassments and beatings in prison, and now goes through continuous emotional distress, paranoia, and lacks the ability to be normal again.

## PARTIES

5.      Emeka Dominic Okongwu is a resident of the City of Buffalo and currently maintains his residence at 220 Main Street, Buffalo, New York, 14214.

6.      City of Buffalo are municipal corporations organized and existing under the laws of the State of New York.

7.      Marcia Scott was a detective with the Buffalo Police Department

## JURISDICTION AND VENUE

8.      This Court has jurisdiction to hear and adjudicate this matter pursuant to 28 U.S.C., Section 1331 and 1343. This Court also has pendent jurisdiction pursuant to the state law violation alleged. Venue is proper in this Western District under Title 28 U.S.C., Section 1391 et seq.

## RELEVANT FACTS OF THE CASE

9.      On or about September 12, 1984, plaintiff and his traditional wife, Doris Agbala were blessed with twin daughters named Nnedi and Chendo.

10.     On or about 1985-1986, plaintiff's wife experienced another pregnancy which ended in a still birth and she succumbed to a coma for approximately 3-4 months, all of which came about because of her pre-existing hyperthyroid condition.

11.     In the same year (1986), plaintiff's wife decided to return to Nigeria due to her illness.

12.     Upon the departure of plaintiff's wife from the United States, plaintiff became the sole custodian of his twin daughters.

13.     In good faith effort to care and provide for his infant children, plaintiff relied on friends and acquaintances to babysit his children while he worked his day and night jobs.

14.     One of his babysitters was Betty Swargard.

15.     Upon information and belief, in 1988 Betty Swargard initiated a complaint with New York State Child and Family Services alleging that plaintiff sexually abused his toddler-aged twins.

16.     In 1988, after a trial held in the Erie County Family Court, plaintiff was exonerated of all allegations of sexual abuse of his twin daughters with the court finding that plaintiff was

negligent because he relied too heavily on friends and acquaintances in the care of his children—in large part because of his work schedule.

17.     Upon information and belief, after the 1988 Family Court proceedings, plaintiff's daughter, without cause or court order, were placed under the custody of defendant, Ollie McNair of the Erie County Department of Social Services and New York State Office of Children and Family Services.

18.     During the time that plaintiff's daughters lived with their foster mother, Ollie McNair, plaintiff enjoyed regular visitations with his daughters.

19.     The said visitations took place mostly at plaintiff's residence

20.     Upon information, Ollie McNair initiated a claim against plaintiff, that once she came into the children's room and observed them playing on top of each other, and that when questioned what they were doing, they allegedly said that it was a simulation of what Daddy did to them when they visited him.

21.     Based solely on such alleged imagination of Plaintiff's four-year old twins, Ollie McNair reported plaintiff to police and a criminal action was initiated.

22.     On February 1, 1994, by an indictment Number 91-2386-001, Plaintiff was eventually charged, along with two other individuals, with a slew of criminal conducts, including but not limited to multiple counts of sexual abuses of his own twin daughters.

23.     After a jury trial, plaintiff was convicted in New York State Supreme Court, Erie County and sentenced to an aggregate prison term with a minimum of 35 2/3 years and a maximum of 107 years.

24.     During his incarceration, plaintiff was subjected to several brutal physical, emotional and psychological abuses from other inmates and employees of the department of correction, including one episode of beatings which landed Plaintiff again in the hospital, and caused the perpetrator to be charged and received one additional year in prison.

25.     Specifically, on November 22, 2010, when Plaintiff was awaiting retrial at the Erie County Holding Cell, in Pod Charlie Short, #53, an inmate housed in Pod Charlie Short, Cell #54 came into Plaintiff's cell and beat him to a pulp, caused him serious injuries to his legs, broken ribs, internal bleeding, and forced to use a can to walk, and when Plaintiff reported the incident to the Sergeant "D", as he was called.

26.     Plaintiff was forced to say that he fell from the double bunk bed in other to take away any investigation of failure to protect from the jail management. However, during the trial of the perpetrator, the seating judge believed that Plaintiff was beaten and did not fall from his bed.

27.     Upon the eventual release of Plaintiff in December of 2011, he was supposed to be given all his properties that were in the possession of the Erie County Holding Cell, including but not limited to various legal documents and personal mementos.  When he requested for those legal documents which contained facts of all the things that happened in his case, he was told that they

3

could not readily be found, that Plaintiff would need to return to the Receiving and Discharge department to ask for the items. However, when Plaintiff returned to the jail, the officers at the jail Receiving and Discharge told Plaintiff that there are no properties for him at the jail any more.

28.     After almost 20 years in prison, plaintiff's conviction and sentence were on March 19, 2010 eventually overturned by an order of the Supreme Court of the State of New York, Appellate Division, Fourth Judicial Department (#68-KA 08-00144), and after almost two more years in jail awaiting the State's decision to retry, Plaintiff was in December of 2011 eventually released from incarceration. His arrest and conviction record have also been expunged.

## COUNT I

### FALSE ARREST, FALSE IMPRISONMENT AND MALICIOUS PROSECUTION AGAINST THE BUFFALO POLICE DEPARTMENT, CITY OF BUFFALO AND MARCIA SCOTT, INDIVIDUALLY AND AS AN OFFICIAL.

29.     The District Attorney, Frank A. Sedita, III, and others in the district attorney's office, including Michael J. Cooper, and Carol Bridge dictated to the Buffalo Police department officers what kind of evidence to collect in connection to the preliminary investigations of the alleged sexual acts against Plaintiff.

30.     Specifically, Michael J. Cooper dictated to the Detective Marcia Scott what kind of evidence to collect from Plaintiff's twin daughters including but not limited to dictating to Ms. Scott to come into an interview of the children with already typed-up facts that she coerced the children to own to and memorize.

31.     Michael J. Cooper dispatched an investigator from the District Attorney's Office by the name of Carol Weigand, and dictated to her to stalk the children at their bus stop and poison their minds with the notion that their life is in jeopardy in the hands of the Plaintiff who could come to the bus stop to interfere with them continuing to be taught how to testify falsely when trial came.

Defendant City of Buffalo had a policy, practice, or custom of failing to adequately train, supervise, and discipline police

32.     As a result of this extraordinary pattern of police misconduct in the late 1980s and 1990s, the Buffalo Police Department was a subject of repeated investigation—particularly with respect to its complete failure to adequately train, supervise, and discipline its officers.

33.     In March 1991 the International Association of Chiefs of Police issued a 300-page report (this Plaintiff was actually one of those interviewed for this report) documenting the Buffalo Police Department's misconduct and, in particular, the department's internal failures to adequately train, supervise, and discipline officers. It found a "serious breakdown" in the Buffalo Police Department's disciplinary procedures, as well as evidence demonstrating that a large number of complaints remained in "inconclusive limbo." It also found that the Buffalo Police Department did a poor job of keeping records about police misconduct.

34.    The report also found instances of officers selling drugs and "ripping off" some drug dealers while protecting others.

35.    At the same time, Buffalo Police Department officers were coming forward to the Buffalo News, lamenting the lack of training at the department. Instead of training, veteran officers would just tell subordinate officers to "[b]e the intimidator."

36.    By April 1991, the Buffalo News, along with the Buffalo NAACP and other citizen advocacy groups, was regularly calling for the Buffalo Police Department to be reformed because of its pattern of abuse and the City of Buffalo's complete lack of any police supervision and discipline or any other meaningful response.

37.    Officials from the U.S. Department of Justice joined by urging that Buffalo create an independent police review board. The Buffalo NAACP supported the same because, as its president explained, Black Buffalo citizens felt there was "nowhere for them to go" with complaints about Buffalo Police Department misconduct.

38.    Despite well-known and well-publicized evidence of police fabricating evidence, suppressing exculpatory evidence, routinely engaging in threatened or actual excessive force, the City of Buffalo policymakers and Buffalo Police Department supervisors took no action whatsoever to curb the deeply embedded misconduct. Their inaction evinced a deliberate indifference to the obvious probability that Buffalo Police Department officers would, and in fact did, violate the constitutional rights of many Buffalo residents.

39.    At the time of the investigation and prosecution of this Plaintiff, the Buffalo Police Department had a practice, policy, and custom of: fabricating evidence, including witness statements, failing to take appropriate disciplinary or other corrective actions with respect to police officers who engaged in illegal or unconstitutional conduct; failing to properly train and supervise officers with respect to the constitutional limitations on their investigative powers; ignoring, with deliberate indifference, systemic patterns of police misconduct and abuse of civilians' rights in the course of police investigations and prosecutions of criminal suspects and defendants, including coercion of witnesses, falsifying and fabrication of evidence and suppression of exculpatory evidence; failing to properly sanction or discipline Buffalo Police Department officers, who are aware of and concealed or aided and abetted violations of constitutional rights of individuals by other Buffalo Police Department officers, thereby causing and encouraging Buffalo Police Department officers, including the Defendant officers in this case, to violate the rights of citizens like this Plaintiff.

40.    At the time of the investigation and prosecution of this Plaintiff, and for many years before and after, the Buffalo Police Department and the City of Buffalo were deliberately indifferent to the need to train, supervise, and discipline police officers. In particular, the Buffalo Police Department failed to provide an internal disciplinary mechanism that imposes meaningful disciplinary and remedial actions in the following respects, among others: a complete lack of disciplinary and remedial actions; a failure to discipline substantial numbers of officers engaging in misconduct; and excessive and chronic delays in resolving disciplinary complaints.

41.     The customs, policies, practices, failures, and inactions of the Buffalo Police Department elaborated above were or should have been known to the policymakers responsible for the Buffalo Police Department, including Detective Marcia Scott, and occurred with deliberate indifference to either the recurring constitutional violations elaborated above or to the strong likelihood that constitutional rights would be violated as a result of failing to adopt and implement systems, policies, training, supervision or discipline in areas where the need for such things to occur was obvious. Given the long and recurring history elaborated above, the Buffalo Police Department and its policymakers were on notice of these deficiencies and failures.

42.     The City of Buffalo through its acts and omissions—including failing to train, supervise, and discipline Buffalo Police Department officers who engaged in misconduct as alleged above and condoning, encouraging, ratifying and deliberately ignoring the pattern and practice of acts and omissions alleged above—is directly responsible for the pattern of misconduct perpetuated by Buffalo Police Department officers, including the egregious misconduct by Defendant detectives in the investigation of this Plaintiff.

43.     As a direct and proximate result of the City of Buffalo's acts and omissions alleged above, Plaintiff sustained injury and damage to be proved at trial. That included, but was not limited to: fabricating a case against Plaintiff, using his daughters to do so while they coerce and threaten Plaintiff's daughters.

44.     Detective Marcia Scott of the Buffalo Police Department was dispatched and worked together with the District Attorney's Office to coach, coerce and intimidate Plaintiff's daughters, including arriving with already prepared script to teach the children, coerce them to learn the script, intimidate them with threats of deportation to Nigeria (at the time that UNICEF was overwhelming showing the deadly plights of hungry war-torn children) though the children were born in the United States, and reward them when she felt they performed well, all in violation of Plaintiff's clearly established constitutional rights.

45.     Both the Buffalo Police Department and the City of Buffalo failed to intervene, train, supervise or discipline Detective Marcia Scott.

46.     As de facto investigators directing and controlling the Buffalo Police Department's criminal investigations, Defendant Marcia fabricated inculpatory evidence; coerced Plaintiff's daughters and threatened to deport them from the United States to Nigeria even though they knew that the twins were American born citizens who could not be deported.

47.     The Buffalo Police Department and Marcia Scott maintained a list of Buffalo citizens that they wanted to "take off the street," despite the lack of probable cause to bring charges against them. Prosecutor Cooper made sure that Detective Scott followed the script and dictated what to fabricate and coerce Plaintiff's twins to say for the grand jury and for the petit jury.

48.     This culture in the Buffalo Police Department netted this Plaintiff into their web of malevolent influences. Plaintiff therefore became the direct victim of Buffalo Police Department corrupt policies, practices, or customs.

49.     Plaintiff's daughters repeatedly attempted to recant their coached statements to both Buffalo Police Department, but they were coerced and threatened to stick to the fabricated story. ADA Cooper did not disclose to the defense information about how he dictated what evidence Detective Scott should gather from Plaintiff's daughters, nor each of the times the daughters attempted to recant the story, nor did he disclose the coercion, pressure, and threats used to maintain the story.

50.     Despite the open and notorious nature of these unconstitutional policies, customs, and practices, and in deliberate indifference to the constitutional rights of criminal defendants they prosecuted, the Erie County District Attorney failed for decades to intervene. Not only were repeat offender prosecutors not disciplined, they were promoted to the highest levels of the office.

51.     As a result of the Buffalo Police Department's aforementioned customs, policies, and practices, in this case, Defendant Cooper directed Scott to coerce, including perjury, and threatened to deport witnesses.

52.     As a direct result of Defendants' intentional, bad faith, willful, wanton, reckless, or deliberately indifferent acts and omissions, Plaintiff sustained injuries and damages that continue to date and will continue into the future, including: loss of freedom for almost 20 years; pain and suffering; severe mental anguish; emotional distress; loss of family relationships; severe psychological damage; loss of property; loss of income; humiliation, indignities and embarrassment; degradation; permanent loss of natural psychological development; and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression, for which he is entitled to monetary relief.

53.     Specifically, and as a direct result of Defendants' intentional, bad faith, willful, wanton, reckless, or deliberately indifferent acts and omissions, Plaintiff sustained physical injuries and damages, including: physical pain and suffering; personal injuries; infliction of physical illness; and inadequate medical care, for which he is entitled to monetary relief.

In addition to the physical injury of being wrongfully imprisoned and confined for almost 20 years, Plaintiff suffered additional physical harm while incarcerated as a direct result of Defendants' intentional, bad faith, willful, wanton, reckless, or deliberately indifferent acts and omissions.

54.     None of the tactics of coercion and coaching of the four-year old witnesses by these named assistant district attorneys had anything to do with the pursuit of a legitimate prosecutorial means, instead, they are evils committed during an administrative part of their prosecutorial duties.

55.     Plaintiff will identify the Police Maker for the Buffalo Police Department who failed to train, supervise and /or discipline these district attorneys to stay away from such practice of

7

dictating to the police investigators what evidence to collect and how to do so. The failure to train, supervise or discipline showed that the policy maker condoned the practices.

## INJURIES AND DAMAGES

56.     Plaintiff re-alleges and incorporates as have been done in paragraphs 1 through 33.

57.      Plaintiff was publicly shamed, ridiculed, humiliated in the presence of his peers, family, friends and the public at large, and his reputation as a decent human being is forever tarnished.

58.     Plaintiff suffered not just humiliation in jail over the type of accusation brought against him, but was on numerous times severely beaten by other inmates who perceived him to be a child molester.

59.     Plaintiff suffered emotional distress and continues to suffer emotional distress over the loss of his freedom, human trust, reputation, consortium of a mate and the ability to freely enter into contracts and be competitive in the society.

60.     Plaintiff, therefore, demands judgment against all defendants, individually, and together, for compensatory and punitive damages in the amount of $36,000,000; and for pre- and post-judgment interest pursuant to 42 U.S.C., Section 1988, and for any further relief as this Court may deem proper and just under all the circumstances herein.

Respectfully Submitted:

Emeka D. Okongwu, Pro Se
Plaintiff

Dated: 6/5/2023